OPINION OF THE COURT
William Davis, J.
The Dime Savings Bank, FSB (Dime), as successor to plaintiffs Lincoln Savings Bank (Lincoln) and Anchor Savings Bank (Anchor), moves for an order: (1) pursuant to CPLR 1018, substituting Dime as party plaintiff instead of Anchor and Lincoln; (2) pursuant to CPLR 602, consolidating the above-captioned foreclosure actions; (3) pursuant to CPLR 3212, granting partial summary judgment with respect to defenses and counterclaims described below; (4) pursuant to CPLR 3215, granting a default judgment against defendants Amerasian Realty Corp. (Amerasian), the State of New York, the City of New York, Morris, Pall & Ling., Inc. and Key Publication, Inc; and (5) pursuant to CPLR 405 (a), replacing the name of defendants John Doe Nos. 1 and 2 with the names of Christo *393 pher Kendall and Theodore Beck, respectively, and replacing the name Access Theater with Access Theater, Inc., and the name of defendant Key Publication, Inc., with .the name Key Publications, Inc. The answering defendants have not submitted any opposition as to items 1, 2, 4, and 5, but oppose the granting of partial summary judgment.
Defendants Battery Dance Co. (Battery), William Albertini, Theodore Beck, Emilio Cruz, Patricia Cruz, Christopher Kendall and Access Theater; Inc. (Access) cross-move for an order granting partial summary judgment to the extent that Dime be ordered to disclose to any prospective foreclosure purchaser the pendency of rent overcharge claims interposed by the defendants. The defendants Albertini, Cruz, Beck and Kendall also cross-move for an order directing the receiver to make certain repairs and/or improvements to the premises.
The first of the two above-entitled actions was brought by Dime’s predecessors to foreclose a mortgage covering real property at 38-82 Broadway, New York, New York. Amerasian, the fee owner of the premises, executed a mortgage in favor of Lincoln in October 1989. Amerasian subsequently defaulted on the debt and a foreclosure action (the first-captioned action above) was commenced in 1994. The defendant tenants took possession of their units at various times under leases which were commercial in form, between 1983 and 1993, all prior to the commencement of the foreclosure action. Dime acquired the assets and rights of Lincoln and Anchor through a series of bank mergers.
In May 1994, a rent receiver was appointed to enter the premises and collect the rents. The second-captioned action was commenced in January 1995, seeking termination of the leasehold estates of all tenants of the premises. Defendants Cruz, Battery, Kendall, Albertini, Beck and Access (collectively, the Answering Defendants) claim that from the inception of their tenancies, Amerasian knew that they were planning to use the premises for residential purposes and encouraged them to perform renovations incident to such use. Collectively, defendants claim to have spent about $375,000 on renovations. They claim that they are now rent-stabilized tenants and that Dime’s interest in the premises is subject to their rights under rent stabilization. Jonathan Hollander and Jacqueline Christy, who are, respectively, the presidents of Battery and Access, maintain that they have used the "corporate” space for their own residences. Dime claims that it did not learn of the Answering Defendants’ alleged residential use until some time *394 after the appointment of the receiver. Dime does not at this point seek summary judgment with respect to the rent stabilization coverage issue (although it mentions that the premises are not legally zoned for residential use). However, Dime asserts that even if the Answering Defendants are assumed to be rent-stabilized tenants, Dime (or a prospective foreclosure purchaser) is not liable for rent overcharges collected by the mortgagor, Amerasian. In other words, Dime contends that a mortgagee who has never collected rents or had any relationship with the tenants is not responsible for any rent overcharges.*
Defendants Cruz, Albertini, Beck, Access and Battery allege as a second counterclaim that Amerasian and its president, Robert Chang, leased the premises to them knowing that they would use them for residential purposes, and encouraged them to expend substantial sums of money to renovate them for combined residential / artist studio use, and that foreclosure of defendants’ interests would result in unjust enrichment. In their third counterclaim, they allege that since the premises are not registered with the New York State Division of Housing and Community Renewal (DHCR), the lawful collectible rent is zero, and that the entire amount of rent collected from them constitutes a rent overcharge. Their fourth counterclaim seeks recovery of attorneys’ fees under Real Property Law § 234.
Kendall’s second counterclaim seeks recovery for unjust enrichment, and his third counterclaim alleges rent overcharges. His fourth counterclaim alleges that Amerasian and Chang fraudulently induced him to enter into a lease for living purposes and promised to provide him with power, knowing at the time that they would be unable to provide him with adequate power for heat, electricity and gas, and that Kendall detrimentally relied on that promise by spending $10,000 on the premises. As his fifth counterclaim, Kendall seeks attorneys’ fees.
Defendants Cruz, Kendall and Access withheld payments of rent by reason of alleged defects in the building. The receiver commenced summary nonpayment proceedings against them in Civil Court. In April 1995, defendants Cruz, Kendall and Access entered into an agreement with the receiver, Gregory Harmon, Esq., under which these defendants would pay certain *395 rent arrears and in return for which the receiver would make certain repairs and improvements including, inter alla, providing a suitable heating system for Kendall. These defendants maintain that some of the agreed upon repairs have not been done. The receiver acknowledges that an agreement was made, without prejudice to the receiver’s right to contest the defendants’ alleged residential status. According to the receiver, a door was repaired, garbage pickup was improved, hallway lighting was improved, the sprinkler system was checked, names as they appear on leases were placed in the lobby. The receiver, however, claims that it would cost as much as $30,000 to perform the work necessary to heat Kendall’s unit, and he opposes any demand that the work be done, at least until the issues regarding Kendall’s alleged residential status are determined.
RENT OVERCHARGE COUNTERCLAIMS
Rent Stabilization Code (9 NYCRR) § 2526.1 (f) (2) states: "a current owner shall be responsible for all overcharge penalties, including penalties based upon overcharges collected by any prior owner. However, in the absence of collusion or any relationship between such owner and any prior owner, where no records sufficient to establish the legal regulated rent were provided at a judicial sale, a current owner who purchases upon such judicial sale shall be liable only for his or her portion of the overcharges, and shall not be liable for treble damages upon such portion resulting from overcharges caused by any prior owner.”
In effect, the above section insulates from liability a good-faith purchaser at a judicial sale who had no notice of the existence of overcharge claims. It would not apply where the purchaser took title knowing of the existence of rent overcharge claims.
Dime cites Rent Stabilization Code (9 NYCRR) § 2520.6 (i), which defines an "owner” as, inter alla, any person or entity receiving or entitled to receive rent for the use of the housing unit and denies that it is an owner within the above definition. A mortgage gives the mortgagee only a lien against the mortgaged premises, but not any incidents of ownership (see, e.g., Ganbaum v Rockwood Realty Corp., 62 Misc 2d 391; Sullivan v Rosson, 223 NY 217). Although the mortgagor executed an assignment of rents in favor of the mortgagee, that assignment did not divest the mortgagor of control of rents until there was a default on the mortgage and the mortgagee took *396 action to take over the collection of rent (see, 1180 Anderson Ave. Realty Corp. v Mina Equities Corp., 95 AD2d 169). It is true, as Dime states, that the rents are presently under the control of the receiver (under court supervision) rather than under Dime’s control. However, the receiver is appointed in a foreclosure proceeding for the ultimate benefit of the mortgagee (Sullivan v Rosson, supra). Ultimately, the mortgagee may become entitled to those rents (Vecchiarelli v Garsal Realty, 111 Misc 2d 157). It appears, therefore, that the tenants (if in fact rent stabilized) would have viable rent overcharge claims against Dime, at least to the extent of the amount of rent paid over to it by the receiver. It is conceivable that if a foreclosure sale purchaser takes over the property and Dime never assumes control of the property, Dime itself could avoid further liability for rent overcharges (cf., Castro v Pelion Realty Corp., NYLJ, Aug. 17, 1994, at 23, col 4 [Sup Ct, Bronx County] [mortgagee who never took possession of the premises, which were ultimately transferred to a foreclosure sale purchaser, was not liable by reason of lead paint on the premises]). Any person or entity, including Dime, however, who bids on the property at the foreclosure sale will have to consider the potential of future liability on rent overcharge claims. In other words, if the defendant tenants ultimately are found to be entitled to rent stabilization status, they will be able to maintain a rent overcharge claim as against the foreclosure purchaser (see, Turner v Spear, 134 Misc 2d 733).
Dime complains that the cloud of rent overcharge claims will prevent it from obtaining an adequate foreclosure sale price, but this is a risk that Dime’s predecessors took when they agreed to accept a real estate mortgage as security for payment of a debt. In light of the above, the rent overcharge counterclaims will not be dismissed. Furthermore, since there is at least a possibility that the purchaser of the premises will be responsible for rent overcharges, Dime is directed to notify any prospective purchaser of the existence of rent overcharge claims. This results in the protection of the tenants, as well as the prospective purchaser. In one case, for example, where a seller attempted to disclaim any representations that the rents charged by the seller were lawful, the court voided the disclaim as against public policy (Costantino v Lynch, 163 Misc 2d 924).
THE OBLIGATION TO PROVIDE HEAT TO KENDALL’S UNIT
Paragraph 31 (c) of the Kendall’s lease provides that the landlord will provide heat to the premises. Moreover, in April *397 1995 the receiver signed an agreement to provide a "suitable” heating system for Kendall. Since the agreement is not specific, this court shall hold an expedited hearing to determine the measures which must be taken to provide a heating system under the agreement.
attorneys’ fees
Dime maintains that even if the tenants ultimately prevail in this litigation, they would not be entitled to attorneys’ fees under Real Property Law § 234. Section 234 constitutes a reciprocal attorneys’ fees section; if the lease gives the landlord the right to recover attorneys’ fees in litigation arising out of a given situation, a tenant who prevails in that type of litigation has a corresponding right to attorneys’ fees. Although Dime is not a signatory to the lease, anyone, including Dime, who ultimately purchases the premises at a foreclosure sale and seeks to assert a claim arising out of the lease will be subject to section 234. In other words, to the extent, if any, that the purchaser at a foreclosure sale would be entitled to attorneys’ fees in litigation against the tenants arising out of the lease, the tenants would have a corresponding right to attorneys’ fees in the event that the tenants prevail. Accordingly, that branch of the motion for an order dismissing the counterclaims for attorneys’ fees is denied.
COUNTERCLAIMS OF UNJUST ENRICHMENT
Dime maintains that none of the unjust enrichment claims has merit. In Horizon Bank v Sigrist (179 AD2d 1020), cited by Dime, a party purchased property subject to an existing mortgage and built improvements on it without first obtaining a release from the mortgage lien. When the mortgagee later foreclosed, the party sought an equitable lien on the premises to the extent of the value of the improvements. In denying the claim, the Court reasoned that since the recorded mortgage should have placed the purchaser on notice that his investment could be taken by the bank in foreclosure, he assumed the risk óf losing the improvements. In the instant case, however, at least some of the tenants (such as Battery) allegedly took possession of the premises long before the mortgage came into being. As to the rest, there is at least a triable issue as to whether or not Dime (or its predecessors) knew about the tenants’ renovations at the time they were performed. Thus, that portion of the motion which seeks dismissal of the counterclaims for unjust enrichment is denied.
*398 DEFAULT JUDGMENTS AND JUDGMENTS BY CONSENT
Defendants City of New York and State of New York have issued waivers of notice of all proceedings in the case, except that they expect to be notified of any surplus money proceedings. Defendants Amerasian, Morris, Pall & Ling, Inc. and Key Publications, Inc. were all served by means of service upon the Secretary of State. This court shall enter a judgment with respect to these parties.
CONCLUSION
Accordingly, the motion and cross motions are decided as follows: (1) plaintiffs’ motion for summary judgment against the Answering Defendants is granted only to the extent that the fifth affirmative defense of Access Theater, Inc., is stricken; the motion is otherwise denied; (2) defendants’ cross motion for judgment directing Dime to notify all prospective purchasers of the pending rent overcharge claims is granted; (3) the issue of the receiver’s obligation to provide a heating system for Kendall, and the obligation, if any, to perform additional repairs pursuant to his agreement with Kendall and other tenants, is set down for a hearing; (4) those portions of the motion which seek substitution of parties, consolidation of the actions, and default or consent judgments against the appropriate defendants is granted.

 Access asserted, as a fifth affirmative defense, that the court lacked personal jurisdiction over it, but has now agreed to withdraw the jurisdictional defense.